## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 17-3021-01-CR-S-MDH** |
| | ) | |
| **JOHN DAVID HALE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### REPORT & RECOMMENDATION OF U.S. MAGISTRATE JUDGE

Pursuant to 28 U.S.C. § 636(b), the above-styled criminal action was referred to the undersigned for preliminary review. Defendant moves to suppress statements and physical evidence seized from his warrantless seizure and warrantless searches of his residential property, vehicle, and cell phone on January 6, 2017. (Docs. 39, 40, and 41.) On January 30, February 23, and March 19, 2018, the undersigned held evidentiary hearings on the instant Motions. (Docs. 64, 68, 70.) Defendant was present with his attorney, Nancy Price. The United States was represented by Abram McGull. During the hearing, the Court received evidence and heard testimony from Ozark, Missouri Police Officer Ben Deutscher, assigned to the Drug Enforcement Administration ("DEA") as a Task Force Officer ("TFO"); DEA Special Agent ("SA") Tim Krisik; DEA SA Mark Hooten; Christian County Sheriff's Deputy Detective and DEA TFO Richard Brett Leslie; Springfield Police Officer Darryl Cooney; Audio/Visual expert David Letsch; Defendant John David Hale; and Defendant's minor son K.H. For the reasons set forth below, it is hereby **RECOMMENDED** that Defendant's Motions to Suppress (Docs. 39, 40, and 41) be **GRANTED in part** and **DENIED in part**.

## I.  Findings of Fact[1]

Around December 20, 2016, officers observed Felix Forjan at a house under surveillance for suspected drug activity.  (Doc. 64 at 6; 68 at 108.)  During a traffic stop, law enforcement found Forjan in possession of six pounds of methamphetamine, arrested him and detained him at the Christian County Jail.  (*Id*.)  On January 5, 2017, TFO Leslie received a phone call that one of Forjan's cellmates had information about the drug investigation involving Forjan.  (*Id*. at 109.) TFOs Leslie and Deutscher interviewed this source of information ("SOI").  (Doc. 64 at 7; Doc. 68 at 109.)  The SOI, later identified as Levi (Doc. 64 at 15), revealed facts he had learned from Forjan about Forjan's arrest and details about methamphetamine Forjan had purchased.  (Doc. 64 at 7-8; Doc. 68 at 110.)  Specifically, the SOI disclosed that Forjan had bought twenty pounds of methamphetamine in New Mexico, had entrusted twelve pounds to a friend in Bolivar, and had sold two pounds before law enforcement arrested him for possession of the remaining six pounds. (*Id*.)  Forjan had also directed the SOI to deliver a letter to a man named John following the SOI's release from Christian County Jail and included a phone number next to John's name.  (Doc. 68 at 109.)  Instead of delivering the letter to John, the SOI gave it to the officers.

After reading the letter, TFO Deutscher believed that a person named John was involved in the distribution of an additional twelve pounds of methamphetamine.  (Doc. 64 at 9.)  Forjan's letter refers extensively to a Federal conspiracy investigation and cautions John to be careful, begging him to "PLEASE BE SAFE AND SMART. I DON'T WANT ANYONE TO BE CAUGHT UP IN THIS SHIT. THE FEDS HAVE BIG EARS TRYING TO PUT TOGETHER A CONSPIRACY CHARGE."  (Gov. Ex. 1 & 2.)  It references individuals in a familiar manner and

---

[1]The facts set forth herein are taken from the testimony adduced and the exhibits admitted at the hearing on the instant Motion.  The hearing transcript appears as Documents 64, 68, and 70.  The Government's exhibit index appears as Doc. 66, and Defendant's exhibit index appears as Doc. 62.

discusses how these mutual acquaintances have either been caught, are under investigation, or are "on the run." In the letter, Forjan indicates that John "HAS 12!" and "MUST DELIVER 4 AT A TIME ON FRONT," specifying "34K FOR 4," but emphatically cautioned, "JOHN MUST NOT SELL. BEING WATCHED BY DEA-FBI-DRONES!!!"[2] The letter instructed "DELIVERY IS TO CHRIS IN ROLLA" and included a detailed map spanning two pages. Additionally, the letter encouraged John to "take out 1/4 LB . . . to party with," and instructed John to have the "Luttrezc boys" help "Levi" find work, explaining that he might "party" with them "but doesn't want to get involved with [Forjan's] world." It also said Forjan "promised Levi a Fender Strat [guitar, t]he one that Bill has," in exchange for delivering the letter, and instructed John to forgive some of Bill's debt in order to pay for the guitar. The letter concludes with a final warning to John: "DON'T MOVE NOTHING YOURSELF."[3]

Following a police database search, TFO Leslie learned the phone number in the letter was associated with an individual named John D. Hale (hereinafter "Hale"), the Defendant in this matter. (Doc. 68 at 109.) TFO Leslie understood the letter to be communicating that Hale was in possession of twelve pounds of methamphetamine and that Forjan wanted Hale to deliver four pounds at a time on a front to an individual named Chris in Lebanon. (*Id*. at 111.) DEA agents arranged an undercover meeting with Hale to deliver the letter in hopes of intercepting the twelve pounds of methamphetamine. (*Id*. at 110-112.) TFO Deutscher, posing undercover, called the phone number from the letter and asked if he was speaking to John. (Gov. Ex. 3.) The individual who answered the phone affirmed he was John. (*Id*.) Deutscher introduced himself as Levi, explained he had just been released from Christian County jail and had "something" he needed to get to him. Hale seemed unsure for a moment until TFO Deutscher explained it was something

---

[2] *See infra* 4 n.6.
[3] *See infra* 4 n.6.

"from Felix."[4]  (*Id.*)  Without hesitation, Hale said that he would be in Springfield that day to take his son to a doctor's appointment, and could meet later that afternoon.  (*Id.*)  Hale followed up with, "…you have something?  Did he tell you some stuff," further evidencing he knew Felix.[5]  (*Id.*)  When TFO Deutscher described he was delivering a letter that explained everything, Hale responded "ok, alright, that's cool," repeating "that's cool" multiple times, and eagerly agreed to meet and speak again.  (*Id.*)  TFO Deutscher called Hale later that day and the two agreed to meet at noon in the parking lot of Home Depot on South Glenstone.  (Doc. 64 at 42; Doc. 68 at 75.) TFO Deutscher said he was driving a white Pontiac Grand Prix, and Hale told Deutscher he was driving a white Chevy pickup.

Prior to the meeting, DEA agents drafted a similar letter, omitting the map and some of the warnings.[6]  (Gov. Ex. 2, Doc. 64 at 9-10; Doc. 68 at 77,112.)  The team of law enforcement officers, dressed in street clothes, parked in the Home Depot lot in unmarked vehicles before the meeting in order to take pictures of the meeting and to protect TFO Deutscher while he was undercover.  (Doc. 64 at 18, 43.)  Additionally, they were prepared to follow Hale once he left the meeting.  (Doc. 64 at 12, 18, 43; Doc. 68 at 77, 113.)

On January 6, 2017, Hale, with his adolescent son in the passenger seat of a white truck, met TFO Deutscher as planned.  (Doc. 64 at 18-19, 58.)  When TFO Deutscher handed Hale the letter, Hale said, "I appreciate this, thank you very much."  (Gov. Ex. 9; Doc. 64 at 20-21.)  TFO Deutscher responded that his "only thing" was he "would like to get paid" and that the letter

---

[4] Contrary to the Government's supplemental brief (Doc. 74), the Court finds from its review of the evidence that it was the undercover agent, not Defendant Hale, who first mentioned the name Felix during the first recorded conversation.

[5] Hale admitted when he testified at the Suppression Hearing that he went to the Home Depot to receive information from Forjan.

[6] The altered letter omitted the language warning Hale not to sell because he was being watched by drones and not to move anything himself. *See supra*, 3 nn. 2-3.

explains Forjan promised him a guitar for his trouble. (*Id*.) Hale got back in his truck and read the letter. (Doc. 64 at 21.) After he finished reading the letter, he returned to speak with TFO Deutscher, and observed TFO Dan Banasik, who was in a silver truck in the parking lot, take a picture. (Doc. 64 at 23; Doc. 68 at 113.) Hale told TFO Deutscher, "We got a problem." (Doc. 64 at 23.) He asked TFO Deutscher if he knew "that cat over there in the gray car" and whether TFO Deutscher saw him take a picture. (Gov. Ex. 9.) TFO Deutscher feigned concern and said that he did not want anything to do with what was going on, but Hale reassured him, confirmed how he could reach him, and encouraged him to stay in contact so he could deliver the guitar in a few days. (*Id*.) TFO Deutscher left the scene.

Hale moved his vehicle near TFO Banasik and watched him for several minutes. (Doc. 64 at 45.) While parked, Hale called TFO Deutscher and asked why he was incarcerated, how he got the letter and if he had shown it to anyone. (Gov. Ex. 9.) TFO Deutscher denied he had shown it to anyone, explained he had been arrested for a parole violation and that Forjan passed him the letter in a toilet paper roll. (*Id*.) Hale responded he "did not like this at all," that he only "worked on cars for him," meaning Forjan, and that he also did not "want to be mixed up in it." (*Id*.)

SA Mark Hooten, part of the surveillance team, recognized that Hale had observed TFO Banasik and his concern for the safety of the officers was immediately heightened. (Doc. 68 at 77-78.) He radioed TFO Banasik and warned him to be careful. (*Id*.) TFO Banasik radioed SA Krisik and asked Krisik to enter and exit the Home Depot and get in TFO Banasik's vehicle to make it appear as if TFO Banasik had been waiting for SA Krisik. (Doc. 64 at 45.) SA Krisik exited the Home Depot and got into Banasik's vehicle, but Hale continued to watch them. TFO Banasik drove away, but Hale followed him north on Glenstone Avenue to a construction site on Republic Road where the agents exited the vehicle hoping that Hale would conclude they were

5

construction workers. (Doc. 64 at 47; Doc. 68 at 81-82.) Hale stopped his vehicle one hundred yards away from the construction site and continued watching them. (*Id*.) After several minutes, TFO Banasik and SA Krisik got back in their truck and drove away. (*Id*.) Hale resumed following them until another agent maneuvered his vehicle between TFO Banasik's and Hale's vehicles, allowing the other agents to get away. (*Id*.) However, Hale began to follow this second agent's vehicle north on Glenstone until Commercial or Division street and then back south until they merged onto James River Freeway. (Doc. 68 at 82.)

SAs Krisik and Hooten testified that it is highly unusual for an individual who has noticed a surveillance officer to attempt to follow that individual. (Doc. 64 at 45; Doc. 68 at 80.) As a result, the agents and TFOs involved believed Hale was acting aggressively and were concerned he was armed and was planning to confront them. (Doc. 64 at 47; Doc. 68 at 83.) Due to the unusual circumstances and what the officers perceived to be an escalating situation, the team contacted Springfield Police Department ("SPD") and requested that an officer stop Hale.

Hale counter-surveilled DEA agents and TFOs for approximately thirty minutes before SPD Officer Darryl Cooney stopped him on James River Freeway near Scenic Ave. (Gov. Ex. 4; Def. Ex. 2.) Hale pulled over immediately once Officer Cooney turned on his lights and siren. Dash cam video shows the day appeared gray and cold with snow on the ground and busy traffic on the highway. Officer Cooney ordered Hale to get out of the truck, put up his hands, and to walk backwards. After a second command, Hale exited his vehicle with his hands raised slightly, but walked forwards towards Officer Cooney, lowering his hands to close his truck door. SA Krisik and Hooten approached Hale from behind Officer Cooney's patrol car with their weapons drawn and again ordered Hale to show his hands and to face his vehicle and Hale complied. As the officers made contact with Hale, SA Krisik held Hale's neck and shoulders and restrained him

against the driver's side of his truck bed.  SA Hooten attempted to lower Hale's head while Officer

Cooney handcuffed him.  Hale resisted by tensing up and lifting his head despite commands to put

his head down towards the truck bed.  Officer Cooney and another agent searched Hale's pockets.

SA Hooten peered through the driver's side window, but no officers searched the truck at this time.

SA Krisik identified himself as a DEA agent, telling Hale he was facing a federal indictment for

twenty years, and Hale inquired, "For what?"  SA Krisik responded Hale knew why and they

would talk about it back at the office.  SA Krisik advised Hale to cooperate and talk with them.

      Throughout the stop, Hale's son was in the passenger seat of Hale's truck, while a DEA

agent stood next to the open passenger door accompanying him.  (Gov. Ex. 4; Def. Ex. 2.)  Hale

informed law enforcement that his son was epileptic and had not taken his medicine that morning.

Law enforcement placed Hale in the back of Cooney's patrol car and SA Krisik asked him why he

had followed the truck at Home Depot.  SA Krisik pressed for a response.  Hale responded that he

had "seen you taking pictures of me," and that he had followed the truck because "it looked like it

was following me."  (*Id*.)  TFO Leslie advised Hale that they were taking him to DEA offices to

talk.  Meanwhile, Officer Cooney returned to the truck, opened the driver's side door to conduct a

protective sweep and observed a .32 caliber handgun in the side compartment of the door, but did

not remove it.  (Doc. 68 at 187.)  He informed the agent next to the passenger side of the vehicle

that he had observed a gun in the driver's side door and returned to his patrol car.

      Because of the safety concerns presented by the busy highway, agents decided to transport

Hale back to the DEA resident office, about ten minutes away, for additional questioning.  (Doc.

68 at 62.)  TFO Leslie drove Hale's truck with Hale's son in the passenger seat, and Officer Cooney

transported Hale in his patrol car.  (Doc. 68 at 114.)  The entire traffic stop lasted eight minutes,

and the trip to the DEA office lasted 10 minutes.  (Gov. Ex. 4; Def. Ex. 2.)

Once they reached the DEA office, Officer Cooney walked Hale into the building. (*Id*.) Agents also invited Hale's son into the building. Before exiting the truck, Hale's son picked up his father's phone from the truck's center console, put it in his pocket and took it inside with him. (Doc. 70 at 9.) Agents gave Hale's son a Snickers bar and some water and kept him separate from his father. (*Id*. at 21.) While at the office, Officer Cooney's body microphone recorded various conversations, including the initial conversation between SA Krisik and Hale and a statement by an unidentified officer who said "he called Felix's daughter." (Def. Ex. 3.) Officer Cooney remained at the DEA office for ten minutes. Before leaving, he again told agents he had found a firearm in the truck. (Def. Ex. 3.) Officer Cooney left with his handcuffs. (Doc. 68 at 186.)

SA Krisik escorted Hale into an interview room and said, "Your only Savior is us," and told Hale not to be a "dick" because if he was "dick" with them they would be a "dick" with him. (Def. Ex. 3.) SA Krisik continued he would talk with Hale civilly and "fucking" expected Hale to talk with him civilly. (*Id*.) SA Krisik told Hale he was facing twenty years for a federal conspiracy case, explaining he could be charged and receive a long sentence even if not in possession of drugs. He further explained they had several people who said Hale was a part of the conspiracy. SA Krisik advised if he cooperated he could "cut that in half," and if he did not want to talk they could "put him in there" and he could "do a good twenty years." (Def. Ex. 3.) SA Krisik suggested the federal system does not reduce sentences for good behavior and told him to "think about it."

Hale again expressed concern for his son, and SA Krisik responded Hale was responsible for endangering his son when he brought him to Home Depot to receive the letter. (Def. Ex. 3.) SA Krisik concluded by telling Hale, "You can't get in any more trouble than you are in right now. . . .The only thing that can help you from this point forward is you can get in less trouble." After this initial three minute conversation, SA Krisik left the room to get Hale some water. (*Id*.) Officer

8

Cooney testified that no one threatened Hale in any way. (Doc. 68 at 186.) SA Krisik and TFO Leslie returned to the interview room ten minutes later and began a conversation with Hale. (Doc. 64 at 63, 69.) During that time, Hale was no longer handcuffed and appeared calm and relaxed, was not nervous or unsettled, did not protest or ask to leave, drank a bottle of water that was offered to him and responded to questioning. (Doc. 64 at 69-71; Doc. 68 at 66-67,126.) SA Krisik and TFO Leslie testified no threats were made, and Hale agreed no weapons were ever drawn or brandished during the interview. (Doc. 64 at 69; Doc. 68 at 116; Doc. 70 at 47.) Hale, who recognized TFO Leslie from Bolivar and the school and church they attended together, asked TFO Leslie if he knew him. (Doc. 68 at 119.) TFO Leslie asked Hale why he was following the vehicles, but Hale did not respond. (*Id*. at 120.) In response to TFO Leslie's questioning about Forjan's letter and its instructions to deliver methamphetamine, Hale denied that he knew anything about methamphetamine and said he had only met Forjan once to fix a car for him. (*Id*.) Hale also denied having anything illegal at his house and reiterated that he did not know anything about methamphetamine but would try to help them. (*Id*.)

TFO Leslie testified that after a ten to fifteen minute conversation, he requested consent to search Hale's property. (Doc. 68 at 121-24.) Although he did not read Hale his *Miranda* rights, he did inform Hale that he had the right to refuse consent. (*Id*. at 121, 127) TFO Leslie presented Hale with a written consent form, which he filled out in front of Hale. (Doc. 68 at 123.) The first two lines of the form, in type print, state "I HAVE BEEN ASKED TO PERMIT SPECIAL AGENTS OF THE DRUG ENFORCEMENT ADMINISTRATION TO SEARCH:" The next line, handwritten by TFO Leslie, reads "1515 E. 380th Rd., Bolivar, MO." Below that was an additional handwritten line by TFO Leslie that reads, "The residence, vehicles, & all outbuildings." (Gov. Ex. 5.) The bottom of the form above the signature line states "I HAVE NOT BEEN

THREATENED, NOR FORCED IN ANY WAY. I FREELY CONSENT TO THIS SEARCH."
TFO Leslie also presented Hale with a separate identical consent form requesting consent to search Hale's iPhone. (Gov. Ex. 6.) Hale read and signed each form in the agents' presence without questions or hesitation. (Doc. 64 at 71-72; Doc. 68 at 126.) After Hale signed the consent forms, TFO Leslie retrieved the phone from Hale's son. (Doc. 68 at 126.) TFO Leslie testified that the phone was not searched prior to obtaining consent and retrieving the phone from Hale's son. (Doc. 68 at 165.) TFO Leslie searched the phone in Hale's presence but found nothing incriminating at that time. (Doc. 68 at 127 and 165.) Hale never objected to the search. (Doc. 68 at 129.) After the interview, DEA agents searched Hale's truck in the DEA parking lot. (Doc. 68 at 160-61.) The agents seized the handgun and also found a glass pipe and 3.5 grams of a substance which field tested positive for methamphetamine in the gas cap of the vehicle. (Doc. 68 at 161.)

DEA agents and Task Force Officers transported Hale and his son, as well as Hale's vehicle, to Hale's residence in Bolivar. TFO Leslie and Hale rode together in TFO Keith Mills vehicle. Hale was not handcuffed. During the forty minute drive, TFO Leslie and Hale conversed about a church they used to attend together. (Doc. 68 at 130.) Hale did not object to the transport nor did he ever revoke his consent. (Doc. 68 at 90, 129-30.)

Once they reached the residence, Hale's son took his medicine. (Doc. 70 at 6.) Law enforcement confined Hale to the living room. (*Id*. at 12-13.) Hale's son testified that he sat on the couch next to his father, who sat in a reclining chair, and that his father did not say anything to the officers while they were there. (*Id*. at 22.) Law enforcement searched the shop on Hale's property next to his house. (Doc. 68 at 132-33.) TFO Leslie testified that, throughout the search, Hale did not protest the search or revoke his consent. (*Id*. at 131, 166-67; 70 at 22.) In the shop, a K9 officer conducted a dog sniff. (*Id*. at 156.) As a result of the dog sniff, the officer found bags

containing a total of 319 grams of a substance which field tested positive for methamphetamine and a bag containing 400 grams of marijuana in a bucket. Agents also found over six thousand dollars in cash in a safe in Hale's pantry. (*Id*. at 164.) Hale was formally placed under arrest and handcuffed, at which point he became agitated and began yelling. (Doc. 68 at 134.) He was advised of his *Miranda* rights, which had not been provided prior to his arrest at the conclusion of the search of his property. (Doc. 68 at 127,155.) This indictment followed.

## II. Conclusions of Law

The fourth amendment protects citizens from unreasonable searches and seizures by the government. U.S. Const. amend IV; *United States v. Va Lerie*, 424 F.3d 694, 701 (8th Cir. 2005). Generally, evidence and the fruit found as a result of an unlawful search or seizure cannot be used and must be suppressed. *United States v. Riesselman*, 646 f.3d 1072, 1078-79 (8th Cir. 2011).

Defendant moves to suppress all evidence obtained following his stop and detention on the side of the highway, arguing his seizure was unreasonable and unlawful. He further moves to suppress evidence obtained from the searches of his vehicle, residential property, and phone, on the grounds that he did not consent voluntarily, and argues, even if voluntary, the searches exceeded the scope of his consent. He also moves to suppress any statements he made, contending he was subject to custodial interrogation without the benefit of *Miranda* warnings. In response, the Government argues law enforcement possessed probable cause to stop and detain Defendant for an investigation, that Defendant voluntarily consented to the searches of his shop, vehicle, and phone, and the searches did not exceed the scope of Defendant's consent. The Government also argues that Defendant's statements were freely and voluntarily uttered and, further, that he was not in custody until he was formally arrested following the search of his shop, and thus his statements made prior to the search of his residence are admissible.

### a. Illegal Seizure of Defendant

Defendant argues he was unlawfully seized and subject to a de facto arrest because law enforcement possessed neither reasonable suspicion nor probable cause to stop his truck and detain him. An officer may briefly stop a vehicle and detain its passengers to investigate suspicion of criminal activity when his suspicions are supported by specific and articulable facts based on the totality of the circumstances. *United States v. Smith*, 648 F.3d 654, 658 (8th Cir. 2011) (*citing United States v. Bell*, 480 F.3d 860, 863 (8th Cir.2007)); *see also Florida v. Royer,* 460 U.S. 491, 500 (1983). A detention may turn into an arrest if the stop lasts for an unreasonably long time or if officers use unreasonable force. *United States v. Navarrete-Barron*, 192 F.3d 786, 790 (8th Cir. 1999). However, an officer may take measures "reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop," including brandishing weapons or using handcuffs. *Smith*, 648 F.3d at 659 (citation omitted).[7] Further, a suspect's involuntary removal and transportation to a police station is lawful if based on probable cause, regardless of whether such continued detention is a formal arrest or an involuntarily detention for further questioning. *United States v. Williams*, 604 F.2d 1102, 1124 (8th Cir. 1979) (*citing Dunaway v. New York*, 442 U.S. 200, 213-15 (1979))

In the present matter, Hale's seizure and detention was reasonable and lawful. Considering all the circumstances, agents not only had specific and articulable facts to stop and detain Defendant, they had probable cause to believe he was involved in a conspiracy to distribute methamphetamine.[8] *See United States v. Chhunn,* 11 F.3d 107, 110 (8th Cir. 1993) (reasonable

---

[7] See also *United States v. Danielson*, 728 F.2d 1143, 1146–47 (8th Cir.1984) (concluding investigatory detention did not become an arrest when the officers drew their weapons before approaching the vehicle occupied by suspected armed bank robbers).

[8] Though Defendant has not raised it as an issue, the Court concludes that Officer Cooney did not need to be able to personally articulate the basis to stop Defendant's vehicle. Communication between law enforcement officers is sufficient. *Smith*, 648 F.3d at 659 ("Police officers may rely upon notice from another police department that a

suspicion to stop driver where, among other factors, officers witnessed him meeting with others suspects and where driver conducted counter-surveillance after officers attempted to avoid detection.); *see also United States v. Slone*, 636 F.3d 845, 852 (7th Cir. 2011) (finding officers had probable cause to stop suspect on suspicions of his involvement in a drug conspiracy when they observed him conducting security surveillance for a drug load). "Probable cause to arrest exists when, considering all the circumstances, police have trustworthy information that would lead a prudent person to believe that the suspect has committed or is committing a crime." *United States v. Edwards*, 891 F.3d 708, 711 (8th Cir. 2018). Probable cause requires only a "probability or substantial chance of criminal activity, not an actual showing of such activity." *Id*. (citation omitted). Officers may have probable cause to arrest without possessing enough evidence to convict for the offense. *United States v. Donelly*, 475 F.3d 946, 954 (8th Cir. 2007). "To establish that a defendant conspired to distribute drugs under 21 U.S.C. § 846, the government must prove: (1) that there was a conspiracy, i.e., an agreement to distribute the drugs; (2) that the defendant knew of the conspiracy; and (3) that the defendant intentionally joined the conspiracy." *United States v. Shakur*, 691 F.3d 979, 989 (8th Cir. 2012). Even a "tacit understanding" between the parties, shown through circumstantial evidence of the defendant's conduct is enough. *United States v. Adams*, 401 F.3d 886, 894 (8th Cir. 2005).

Here, the totality of the circumstances provided probable cause that Defendant was a part of a conspiracy to distribute methamphetamine. *Smith*, 648 F.3d at 659; s*ee also United States v. Walters*, No. 4:09CR802 ERW, 2010 WL 11469118, at *8 (E.D. Mo. Oct. 8, 2010) (probable cause

---

person or vehicle is wanted in connection with the investigation of a felony . . . 'even if the notice omits the specific articulable facts supporting reasonable suspicion.'"); *United States v. Thompson*, 533 F.3d 964, 968-69 (8th Cir. 2008) ("The collective knowledge of law enforcement officers is sufficient to provide reasonable suspicion."); *United States v. Williams*, 429 F.3d 767, 771-72 (8th Cir. 2005) (collective knowledge doctrine sufficient to impute knowledge to an officer who received a radio request from other officers to stop a vehicle).

to believe Defendant was involved in conspiracy). Based on their knowledge, investigation and observations, the agents knew that Forjan was arrested and indicted for possession of six pounds of methamphetamine with intent to distribute. An informant contacted the agents and detailed the facts surrounding Forjan's arrest, bolstering his veracity and reliability, and revealed that Forjan had disclosed plans about another delivery of methamphetamine. He also disclosed that Forjan had requested him to deliver a letter to a man named John about these plans. This letter was directed to a man with Defendant's name and included Defendant's phone number. When contacted, Defendant confirmed he was John, acknowledged he knew Forjan and agreed to meet to receive the letter. Agents testified, based on their training and experience, they believed the letter was directed to Defendant and instructed him to deliver twelve pounds of methamphetamine.

Defendant drove out of his way to meet the undercover agent and thanked him for delivering the letter. The detailed letter was written in a familiar tone, referencing other individuals and events in a manner evidencing "John" knew who and what Forjan was writing about. Not only does the letter repeatedly caution Defendant to beware of federal agents trying "to put together a conspiracy," it also uses terms consistent with drug transactions, instructing him to deliver "4 AT A TIME ON FRONT" for "34k," and discussing other details, such as: disclosing Forjan's need to raise as much cash as possible in a month, describing federal agents' belief that "Bill is top dog" in another "bust," discussing Aaron's father being "on the run," warning that others cannot go "hunting if they got felonies," revealing concern that "phones are tapped," and explaining the informant "doesn't want to get involved with [Forjan's] *world*." (Gov. Ex. 2).

After reading the letter and suspecting he had been photographed, Defendant reassured the undercover agent and confirmed he would deliver the guitar, evidencing his knowledge of the purpose of the letter, his intent to follow Forjan's instructions and his involvement in the

14

conspiracy. Defendant then surveilled two unmarked vehicles for more than thirty minutes. In all, Forjan's arrest for possession with intent to distribute, the details of a drug conspiracy included in the letter, the SOI's knowledge of Forjan's arrest and disclosure of the letter, coupled with Defendant's agreement to receive the letter, his lack of hesitation or question, his knowledge the letter was from Forjan,[9] his conversations with TFO Deutscher thanking him for delivering the letter, his assurance that everything would be ok, his confirmation to deliver the guitar in exchange for the letter, and his subsequent behavior in surveilling unknown vehicles after he had been photographed, provided probable cause to arrest or detain Defendant.

Consequently, the decision to draw weapons, handcuff and transport the Defendant was not unreasonable and did not transform the stop into an unlawful de facto arrest. Regardless of whether Defendant knew he had been photographed by undercover police or other drug consorts, the agents' use of weapons and handcuffs upon their initial encounter with Defendant was not unreasonable. *See Navarrete-Barron*, 192 F.3d at 791. Agents observed Defendant receive a letter about drug distribution, convey his intent to comply with instructions in a letter, and conduct unusual counter-surveillance activity, which justified a use of force reasonably necessary for protection and to maintain the status quo. *Id.* Moreover, because Defendant's continued detention was based on probable cause, it was not unreasonable to transport Defendant from the side of a busy highway to DEA offices a short distance away, particularly in light of the dangerous conditions of the road. *Williams*, 604 F.2d at 1124. As such, the Court concludes the stop, transportation and detention of Defendant was not a violation of Defendant's Fourth Amendment rights and evidence obtained as a result of his seizure should not be excluded on this basis.

---

[9] Defendant also later testified that he went to Home Depot for the purpose of picking up a letter he knew was from Forjan, evidencing he knew Forjan and likely had a relationship with him.

15

### b. Voluntariness of Consent

Defendant next argues he did not voluntarily consent to the searches. Evidence obtained via a warrantless search is inadmissible, unless law enforcement conducts the search with voluntary consent. *United States v. Chaidez*, 906 F.2d 377, 380 (8th Cir. 1990). *Id.* Consent is voluntary if it is the "product of an essentially free and unconstrained choice," rather than "the result of duress or coercion." *Id.* (*citing Schneckloth v. Bustamonte*, 412 U.S. 218, 225-27 (1973)). Whether consent was given voluntarily and without coercion is based on the totality of the circumstances, including defendant's age, intelligence and education; and whether he was under the influence of drugs or alcohol, informed of his *Miranda* rights, or had experience with the legal system and knowledge of its protections. *United States v. LeBeau*, 867 F.3d 960, 971 (8th Cir. 2017). Courts also consider "the environment in which consent was given and whether the police threatened, intimidated, punished, or falsely promised something to the defendant; whether the defendant was in custody, how long he had been detained, or gave consent in a public or secluded area. *Id.* The government must show voluntary consent by a preponderance of the evidence. *Chaidez*, 906 F.2d at 380.

Defendant argues his consent was involuntary because he gave it as a consequence of being in a lengthy custody, without the benefit of a *Miranda* warning, and was subject to threats and improper coercion. Although a few factors weigh in Defendant's favor, the Court finds that Defendant voluntarily consented to the searches of his cell phone and the residency, vehicles, and outbuildings located at 1515 E. 380th Rd. in Bolivar, Missouri.

First, Defendant was 35 years old and was not intoxicated at the time of his arrest. (Doc. 70 at 38, 46.) He appeared to SA Krisik to be of at least average intelligence, had finished some college, and had run his own business. (*Id.* at 37-39.) Although he was not advised of his *Miranda*

rights, TFO Leslie informed Defendant that he did not have to sign the consent form. (Doc. 68 at 121.); *see United States v. Cobo-Cobo*, 873 F.3d 613, 616 (8th Cir. 2017). ("[o]fficers need not provide Miranda warnings before requesting consent to perform a search."); *United States v. Beasley*, 688 F.3d 523, 531 (8th Cir. 2012) (noting the "absence of [Miranda] warnings [does not] make an otherwise voluntary consent involuntary"). Further, not only did Defendant read and sign the form, he also had experience with the legal system and knowledge of its protections, having been arrested multiple times, and having previously given consent to search his residential property in 2014. (Doc. 68 at 134; Doc. 70 at 40.)

Secondly, Defendant's detention was not lengthy or coercive. *See United States v. Rakotojoelinandrasana*, 450 Fed.Appx. 549, 551 (8th Cir. 2011) (five hour detention did not make consent involuntarily where defendant signed a consent form, was not handcuffed, and officers were in street clothes, kept their weapons concealed, and did not threaten defendant.) Here, the encounter on the road and transport to DEA lasted roughly eighteen minutes and Defendant's interview lasted less than thirty minutes. Defendant was not handcuffed during interrogation and both SA Krisik and TFO Leslie wore street clothes and kept their weapons holstered throughout.

Further, neither was Defendant's will so overcome by threats, physical intimidation, or punishment by law enforcement as to render his consent involuntary. Though agents used some force to detain Defendant on the side of the road, the use of force was not unreasonable and the situation de-escalated long before Defendant gave consent.[10] While SA Krisik's initial discussion was assertive and used expletives, his raised voice and accusations were not so threatening as to overbear Defendant's will. *See United States v. Sanchez*, 676 F.3d 627, 631 (8th Cir. 2012) (finding officer's raised voice and accusatory language was not coercive). Additionally, SA

---

[10] *See e.g. United States v. Conteras*, 820 F.3d 255, 270 (7th Cir. 2016) (The use of force to affect an arrest or to protect officer safety does not indicate that a defendant's subsequent consent is involuntary).

Krisik's explanation about prison terms and conspiracies were not false promises for leniency but merely informed Defendant of the charges which could be brought against him on the evidence the DEA had already collected, and then offered Defendant a way to cooperate. *See Sheets v. Butera*, 389 F.3d 772, 778 (8th Cir. 2004) (*citing Smith v. Bowersox*, 311 F.3d 915, 922 (8th Cir. 2002)) (finding that direct or indirect promises for leniency or threats do not render a confession involuntary "unless it overcomes the defendant's free will and impairs his capacity for self-determination."); *see also United States v. Meirovitz*, 918 F.2d 1376, 1379 (8th Cir. 1990) (use of long prison sentence was not improper threat); *United States v. Pierce*, 152 F.3d 808, 813 (8th Cir. 1998) (noting a "false" promise of leniency for cooperation can be coercive).

Here, Defendant did not appear nervous or distressed, engaged in conversation with the agents, and was cooperative after he signed the consent. Moreover, Defendant's contention that his concern for his son was his primary motivation for signing the consent and that agents improperly used this to coerce consent is disingenuous. (Doc. 70 at 29.) Prior to the traffic stop, Defendant took his son to meet an individual he knew was associated with a drug dealer and whom he had never met. (Gov. Ex. 4; Def. Ex. 2.) Defendant then surveilled unknown vehicles for thirty minutes rather than return to Bolivar where his son kept his medication. Defendant's concern for his son's health apparently began only after he was apprehended. The argument that Defendant was so concerned for his son that he was compelled to sign a consent form is thus unpersuasive.

Finally, Defendant remained silent and did not object to either the search of his phone or to the search of his home and outbuildings. During the forty-minute drive to his house, he never told officers that he wanted to revoke his consent and did not appear agitated. While at his house, Defendant never moved from his chair during the search, and never objected to the search nor appeared agitated. Even more compelling, Defendant testified that he did give consent to search

18

his residence. Notably, both SA Krisik and TFO Leslie, as well as Defendant's own son testified that Defendant was not upset while officers searched his home and that he never said anything or otherwise revoked his consent.

Although Defendant was not provided *Miranda* warnings and was questioned in a secluded office while in custody, the Court finds Defendant's consent was the product of a free and unconstrained choice. Considering defendant's age, intelligence, and prior experience with law enforcement, his cooperation, the fact that he read and signed the form that advised he was freely consenting, TFO Leslie's warning that he did not have to consent, his silence during the search and failure to revoke consent, as well as the short detention, and the absence of false threats or improper coercion, the totality of the circumstances establishes Defendant consented voluntarily.

### c. Scope of Defendant's Consent as to Shop

Defendant next argues the methamphetamine and marijuana obtained from his shop was unlawfully seized because the search of the shop was outside of the scope of his consent. Defendant contends that when he signed the handwritten consent form, the form only included the phrase granting consent to search "1515 E. 380th Rd., Bolivar, MO." Defendant contends that TFO Leslie added the second line on the form, which included the phrase "[t]he residence, vehicles, & all outbuildings" after he had signed it, arguing that he therefore only consented to a search of his residence but not the shop. In support of this, Defendant points to the difference in size between the text on the first and second handwritten lines of the form and further claims deficiencies in TFO Leslie's investigation demonstrates a lack of credibility.

First, the Court finds TFO Leslie's testimony, that the consent form included both lines before Defendant signed it, is credible. (Doc. 68, p. 160). *See United States v. Coney*, 456 F.3d 850, 860 (8th Cir. 2006) (a trial judge has discretion to assess the credibility of witness for the

19

purpose of a motion to suppress.) Additionally, based on the undersigned's observations during the hearings and the inconsistency in Defendant's testimony, the Court finds the Defendant's son credible but finds the testimony of the Defendant less than credible. Defendant's bare allegations do not persuade the Court that the form was improperly altered. Nor does the Court agree the evidence of record reveals a request to delete any video. Moreover, Defendant never objected to the search. Where a person is present and fails to object to the continuation of a search, courts consider such circumstantial evidence to provide proof that the search was within the scope of consent. *See United States v. Lopez–Mendoza,* 601 F.3d 861, 868 (8th Cir. 2010). As such, evidence found in the shop should not be suppressed.

### d. Scope of Defendant's Consent as to Truck

Defendant contends he only consented to a search of vehicles at his residence. He argues the firearm, methamphetamine, and drug paraphernalia found in the search of his truck parked at the DEA office were unlawfully seized because the search was beyond the scope of his consent.

The Court agrees that Defendant did not consent to the search of his truck at the DEA office. The scope of a person's consent to a search is defined by "objective reasonableness," which asks "what the typical, reasonable person would have understood from the exchange between the officer and the suspect." *United States v. Beckmann*, 786 F.3d 672, 678 (8th Cir. 2015). Here, Defendant gave written consent to search the "vehicles" located at "1515 E. 380th Rd." The Government assumes, without arguing, that the scope of Defendant's consent included a search of a truck that was not located at this property, but fails to discuss whether the typical, reasonable person would have understood he was effectively giving permission to search his truck regardless of where it was parked. Other than TFO Leslie's testimony that he believed the consent included the vehicle located at the office and that he had explained the form to the Defendant, the record

contains little evidence of the exchange and understanding between the Defendant and TFO Leslie or that Defendant gave oral consent or otherwise signed a separate consent to search his truck at the DEA office. In light of this, the Court finds it was not objectively reasonable for an officer to conclude the consent to search vehicles at a specific property included a vehicle at the DEA office.

The Government also suggests the gun was lawfully found when it was observed in plain view during Officer Cooney's protective sweep. A protective sweep conducted after the vehicle's occupants have been detained or secured is authorized only when they "might later access" the vehicle. *United States v. Smith*, 645 F.3d 998, 1002 (8th Cir. 2011) (*citing Michigan v. Long*, 463 U.S. 1032, 1045-52 (1983)). At the time Officer Cooney conducted the search, Defendant was handcuffed and secured in the back of the patrol vehicle. Both SA Krisik and TFO Leslie made it clear they were transporting Defendant to the DEA offices for questioning and that they would drive Defendant's truck. Once secured for transport, it was not possible for Defendant to access the vehicle and the justifications for a protective sweep were absent. Thus, a protective sweep of the vehicle after Defendant had been secured and disallowed from reentering his vehicle was unreasonable. Because Officer Cooney observed the gun during an unlawful protective sweep, the Court finds the gun was not lawfully observed in plain view. *United States v. Class*, 883 F.3d 734, 737 (8th Cir. 2018) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993)).

Neither is the Court convinced the search was authorized pursuant to the automobile exception. The automobile exception to the warrant requirement authorizes a warrantless search of a vehicle based on probable cause that the vehicle contains contraband. *Edwards*, 891 F.3d at 712. The Government claims agents had probable cause that the truck "contained evidence of criminal activity, including, but not limited to the 12 pounds of methamphetamine," (Doc. 74 at 20), but fails to properly support this contention. Here, the evidence supports probable cause that

Defendant was engaged in a conspiracy with Forjan, a known drug dealer, about a future delivery of drugs and had affirmed his intent to follow the instructions in the letter. In the Court's view, evidence of Defendant's association with a known drug dealer and his agreement to receive a letter and participate in the future delivery of drugs, does not necessarily provide probable cause to believe his vehicle had evidence of contraband when it was seized.[11]

In the case at bar, the agents had never observed Defendant engage in a drug transaction, did not observe a present drug transaction on the day of the encounter, and did not have information from a source that Defendant had participated in a prior drug transaction or would be in possession of drugs on the day he came to receive the letter. They did not make any observations of drug paraphernalia, drug packaging or hidden compartments during the encounter. Neither did they smell the presence of drugs, masking odors or have a drug dog at the scene to make a positive identification. At most they had an inchoate hunch that someone associated in a drug conspiracy could have contraband in their vehicle, but this suspicion does not amount to probable cause to support a warrantless search. In fact, SAs Krisik and Hooten as well as TFO Leslie testified that the plan was to follow Defendant in hopes he would lead them to the remaining methamphetamine, suggesting no one reasonably believed Defendant came to the meeting in possession of the drugs he had not yet been instructed to deliver.

The Government alternatively argues that the warrantless search of the truck was authorized as a search incident to arrest. An officer may, "as a contemporaneous incident of [an] arrest," lawfully search an arrestee's vehicle if the arrestee is within reaching distance of the passenger compartment at the time of the search or if it is reasonable to believe the vehicle contains evidence of the arresting offense. *Arizona v. Gant*, 556 U.S. 332, 347 (2009). Here, however the

---

[11] The Government does not articulate whether probable cause supported the belief that evidence of the conspiracy would be located in the truck, and therefore the undersigned does not address this.

search was not contemporaneous, but rather, was conducted nearly an hour later, after the vehicle had been transported to the DEA offices and following the Defendant's interview. Accordingly, the Court finds the search was too remote to be justified as incidental to an arrest.

Finally, the Government argues the search of the truck was authorized because TFO Leslie was performing the "community caretaker function" when he removed the truck from the side of the road. The Government ignores, however, the fact that although TFO Leslie was present in the vehicle, he never testified that he searched the truck, observed the firearm or had knowledge of its existence while he was present in the truck. An officer's mere presence in the location where evidence was previously and unlawfully found by a different officer does not justify a seizure with an ad hoc rationale. Thus the Court finds this exception is not applicable from the facts and evidence as presented. Based on the arguments advanced by the Government, the firearm, methamphetamine, and drug paraphernalia found in the search of the vehicle should be suppressed.

### e. Scope of Defendant's Consent as to Phone

Defendant moves to suppress all evidence obtained from his cell phone, arguing it was searched prior to his consent. First, Defendant does not articulate what evidence obtained from the phone should be suppressed. The testimony is that there was nothing incriminating found on the phone. Secondly, the record is inconclusive whether the phone was searched prior to TFO Leslie's consent search. The statement, "he called Forjan's daughter," made by an unidentified officer may give rise to an inference that someone obtained information from the phone unlawfully. However, Defendant elicited no testimony nor other evidence to establish who said or heard this, who the "he" in the statement was about, whether this statement was made as a result of an agent improperly searching the phone or based on prior knowledge that agents had developed during the investigation. Even assuming the phone was impermissibly searched, evidence

23

obtained from the phone is admissible under the doctrine of inevitable-discovery. "Under the inevitable-discovery exception, evidence that 'ultimately or inevitably would have been discovered by lawful means' need not be suppressed." *Hogan v. Kelley*, 826 F.3d 1025, 1028 (8th Cir. 2016) (*quoting Nix v. Williams*, 467 U.S. 431, 444 (1984)). "For this exception to apply, the government must prove by a preponderance that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct and that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation." *Hogan*, 826 F.3d at 1028 (citation omitted).

Here, TFO Leslie testified the phone was not searched until after Defendant granted consent and he retrieved the phone from Defendant's son. Even assuming another officer had unlawfully searched the phone prior to Defendant's consent, the Court finds by a preponderance there was a reasonable probability that TFO Leslie was pursuing an alternative line of investigation and lawfully searched the phone after he secured Defendant's voluntary consent. Evidence obtained from the phone is therefore admissible.

### f. Motion to Suppress Statements

Finally, Defendant moves to suppress all statements made while he was subject to custodial interrogation, arguing he was not given any *Miranda* warnings until he was formally arrested at his house. A custodial interrogation exists where an officer has initiated questioning after a person has been "deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). *Miranda* requires law enforcement to warn a suspect about the privilege against self-incrimination and the assistance of counsel prior to interrogating a suspect in custody. *United States v. Cowan*, 674 F.3d 947, 957 (8th Cir. 2012). Interrogation includes "express questioning" and any questioning that is "'reasonably likely to elicit' incriminating information."

*Id*. at 958. Custody exists where a "reasonable person in his position would not have felt free to terminate the interrogation and leave." *Id*. at 957. Courts consider several factors to determine whether a suspect is in custody, including: (1) whether police told the suspect he could answer voluntary, he could leave, or was not under arrest; (2) whether the suspect's movement was restrained; (3) whether the suspect initiated contact or voluntarily acquiesced to questioning; (4) whether police used coercive or deceptive tactics; (5) whether police "dominated" the atmosphere of questioning; and (5) whether the suspect was arrested after the questioning. *Id*. (citing *United States v. Griffin,* 922 F.2d 1343, 1347 (8th Cir.1990)). "[T]he critical inquiry is not whether the interview took place in a coercive or police dominated environment, but rather whether the defendant's freedom to depart was restricted in any way." *Id*.

In the present matter, neither party specifically articulates when they believe Defendant was subject to custodial interrogation. The Court finds Defendant was first questioned while in custody when he was initially detained on the side of the highway, handcuffed, patted down and placed in Officer Cooney's patrol car. *See id*. at 958 (finding that no reasonable person who was detained, handcuffed, and patted down would feel free to leave or terminate questioning). Here, Defendant's freedom to depart was restricted when he was handcuffed and placed in the patrol car. While Defendant was in custody, SA Krisik pressed him about why he was following the truck at Home Depot, a question seeking more than routine identifying information and designed to elicit incriminating information about actions related to suspected criminal behavior. No one told Defendant he was free to abstain from answering questions or provided any other warnings. Thus, Defendant's statements made in response to SA Krisik following his detention regarding why he followed the truck should be suppressed.

Whether the subsequent questioning of Defendant at the DEA offices was custodial is a closer question.  The first *Griffin* factor weighs in favor of custody.  Although Agent Krisik advised defendant that they were going back to the offices to "talk," no one advised Defendant that the interview was voluntary, that he was free to leave or whether he was under arrest.

The second and third factors are less clear.  Defendant did not initiate contact with authorities.  Instead, he was pulled over and involuntarily transported to DEA offices for further questioning, escorted in handcuffs to an interview room, and remained in the presence of law enforcement during the entire encounter.  *United States v. Longbehn*, 850 F.2d 450, 452–53 (8th Cir. 1988) (finding continuous police supervision, including transportation in a police vehicle rendered detention custodial); s*ee Griffin*, 922 F.2d 1343, 1350-51, 1354 (finding a police escort or commands intended to dictate a suspect's course of conduct will trigger a finding of custody).  Even if the handcuffs were eventually removed, it does not suggest Defendant was free to move about during questioning and the record is silent on whether Defendant tried to move about or leave the room.  *See United States v. Ollie,* 442 F.3d 1135, 1138 (8th Cir. 2006) (finding it impossible to determine whether the defendant's freedom of movement was restrained because the record was "thin.")  SA Krisik asked Defendant if he wanted water after their initial conversation, suggesting that Defendant was expected to stay longer and could not leave.  *See United States v. Carter*, 884 F.2d 368 (8th Cir. 1989) (finding defendant was in custody where he was told to "just stay here" and was not told he was free to leave or that he did not have to answer questions).  Once the interview began, the record is unclear how long Defendant remained handcuffed and whether he possessed unrestrained freedom of movement during questioning.[12]  Although SA Krisik and

---

[12] Krisik and Leslie testified the handcuffs were removed once Defendant was brought into the interview room. Defendant testified he was handcuffed throughout the interview. Officer Cooney testified that he left the building with his handcuffs, suggesting the handcuffs were removed at some point after he escorted Defendant into the building and prior to his departure. Because his body mic recorded the initial interview, the evidence suggests that

TFO Leslie described Defendant as responsive to questioning (Doc. 64 at 69; Doc. 68 at 124), it is unclear whether this was in response to the police dominated environment or if Defendant voluntary acquiesced to questioning.

As for the last three factors, the Court finds that no strong arm tactics or deceptive stratagems were employed during the questioning. Despite Defendant's contentions, Krisik's assertions about the amount of prison time Defendant was facing were not deceptive, nor were they coercive. *See United States v. LeBrun*, 363 F.3d 715, 721 (8th Cir. 2004) (noting that "coercive aspects of police interview are largely irrelevant to custody determination except where a reasonable person would perceive the coercion as restricting his or her freedom to depart"); *United States v. Laurita*, 821 F.3d 1020, 1026 (8th Cir. 2016) (noting cases finding police methods involving raised voices, accusations and strong language are not considered "strong-arm or deceptive tactics"). However, although not coercive, the Court does find the atmosphere of questioning was police dominated. As described above, Defendant was detained and involuntarily transported to DEA offices, isolated from his son, placed in an interview room in law enforcement offices, disallowed from contacting family, subjected to police dominated questioning, and subsequently escorted to his home for the execution of a consent search. Lastly, Defendant was arrested following the search.

The above factors, coupled with the fact that he was never advised whether he was under arrest, demonstrate his movement was restrained to a degree commonly associated with formal arrest and no reasonable person would feel free to terminate the questioning or leave. As such, the Court finds that the questioning of Defendant in the interview room was custodial and Defendant

Officer Cooney was in or near the interview room and thus that the handcuffs could have remained on until Officer Cooney's departure, including during this initial conversation.

should have been provided *Miranda* warnings. Defendant's incriminating statements made in response to questioning in the interview room are therefore not admissible.[13]

## III.    Recommendation

Based on the foregoing discussion, the undersigned hereby **RECOMMENDS** that Defendant's Motions to suppress the signed consent forms, and the physical evidence seized from his property and cell phone, including the methamphetamine and marijuana found in Defendant's shop and the cash found in the safe in Defendant's pantry, be **DENIED**; and, further, the that Defendant's Motions to suppress incriminating statements and physical evidence seized from his vehicle searched at the DEA office, including the firearm, glass smoking device and 3.5 grams of methamphetamine, be **GRANTED**.

DATE:    January 2, 2019

/s/ *David P. Rush*
DAVID P. RUSH
UNITED STATES MAGISTRATE JUDGE

---

[13] In response to questioning, Defendant stated that he knew Felix Forjan. This is the only incriminating statement made during the interrogation that the parties put into the evidence of record. Further, Defendant's consent to search is not an incriminating statement. *Beasley*, 688 F.3d at 531-32.

28